HEARD APRIL TERM, 1879.

CASE No. 765.

## A. L. ANNELY ET AL. v. W. G. DE SAUSSURE, EXECUTOR, ET AL.

1. Findings of fact by a referee in an equity cause, concurred in by the Circuit judge, reversed, as being without evidence to sustain them. Mc-IVER, A. J., *dissenting.**

2. Where an executrix, who is also a legatee, sues a mortgagor for the foreclosure of a mortgage given her testatrix, making the other legatees parties defendant, and the mortgage is declared satisfied by the Circuit Court, whose judgment, upon appeal by the executrix alone, is reversed— *Held,* that the reversal cannot benefit the defendant legatees not appealing, and to the extent of their interests in the estate, the executrix cannot recover.

3. An attorney has implied authority to obtain and enforce satisfaction of his client's demands, and to bind him as a party litigant in certain matters appertaining to the conduct of his causes, but has no general power to contract independently in relation to such demands nor to transfer them. *Per* WILLARD, C. J.

4. A forfeiture to the state for taxes, but with the right of redemption existing, does not extinguish the lien of a mortgage. *Per* WILLARD, C. J.

5. The state is not a proper party to an action for the foreclosure of a mortgage upon lands which have been forfeited to the state for non-payment of taxes. *Per* WILLARD, C. J.

6. When unpaid taxes constitute a lien upon mortgaged property, a judgment of foreclosure and sale should order such taxes to be paid out of the proceeds of sale. *Per* WILLARD, C. J.

7. Mortgagees of land are not bound to give to purchasers from the mortgagor any further notice of their claim than that which the record of the mortgage gives. *Per* WILLARD, C. J.

8. When tenants in common make sale of land, and set apart the interest of one co-tenant in the purchase money to be applied to the credit of a bond secured by a mortgage upon such co-tenant's interest in the land, the mortgagees are not bound by such sale, nor will the court require them to acquiesce, upon proof that it was an advantageous sale, or because of the rights and interests of the other parties. *Per* WILLARD, C. J.

9. A mortgagee has no title to the mortgaged land, but he holds the legal title to the lien created by the mortgage. *Per* WILLARD, C. J.

10. Where the executor of a mortgagor advised a purchaser that a clear, unencumbered title was being conveyed, and the purchaser believing such statement, completed his purchase and erected improvements, *held* that the improvements were not excepted from the lien of the mortgage. *Per* WILLARD, C. J.

* See note at the end of this volume.

Before REED, J., Charleston, May, 1877.

This was an action for a foreclosure of a mortgage, instituted by Amelia L. Annely and Julia A. Blake, as devisee and as executrix of Anna Maria Annely, against Wilmot G. De Saussure, executor of John W. Lewis, F. P. Lewis, J. W. A. Lewis, the Commercial Wharf and Cotton Press Company, and the heirs of John W. Lewis.

The case is fully stated in the report of Hon. B. G. Pressley, which, upon the matters considered by this court, is as follows:

*To the Honorable Jacob P. Reed, Judge of the said Court:*

By your order of March 16th, 1876, the issues of law and fact in this case were referred to me to report thereon to the court, with leave to report any special matter.

I respectfully report, that in connection with the solicitors of the plaintiffs and defendants, I have taken the testimony filed with this report, and find thereon the following facts, to wit:

On January 5th, 1859, John W. Lewis, Sr., was indebted to Amelia and Anna Maria Annely on two bonds, each in the sum of $5813, with legal interest, payable semi-annually until the whole amount be paid. These bonds were secured by mortgage of his one-fourth share of the commercial wharves in Charleston, and the whole principal and interest to be computed with semi-annual rests, from January 5th, 1865, are now due and unpaid.

In October, 1865, Anna M. Annely died, leaving in full force her will, whereby she bequeathed the bond held by her to Amelia J. Lewis, Francis P. Lewis and John W. Lewis, Jr., of whom the first named, before the death of Miss Annely, had intermarried with Julius A. Blake. She was appointed and qualified as executrix of said will, and in that character is one of the plaintiffs in this case. On July 14th, 1872, Miss Amelia Annely and Mrs. Blake, executrix, placed their said bonds and mortgage in the hands of W. G. De Saussure for friendly fore-closure. He was survivor of H. A. De Saussure & Son, who, before that time, had been the legal advisers of the mortgagor and also of Miss Annely. Her letter, accompanying the de-livery of the bonds and mortgage to Mr. De Saussure, simply

directs him " to take charge of her interest in regard to the fore-
closure of the bond in her possession, all parties consenting."
The other bond held by Mrs. Blake, executrix, was delivered to
same solicitor under same instructions.

Previous to that time the said wharves had been placed for
sale in the hands of L. D. De Saussure, broker. His authority
was from the mortgagor and the trustees of John Fraser & Co.,
who then held an undivided one-half of said property. The
price limited by them for the whole was $40,000, but no offer
was made for it at that price. When Mr. W. G. De Saussure,
as attorney of the mortgagees, applied to the mortgagor for his
consent to a decree of foreclosure, he refused to give it, unless
the mortgagees would first agree to release him from personal
responsibility on his bonds, and look for payment only to the
mortgaged property. To that all the mortgagees, except John
W. Lewis, Jr., assented, and his refusal stopped the foreclosure
at that time. Mrs. Blake, being daughter of the mortgagor,
would not press the foreclosure against his consent, and if that
were to be done, Mr. De Saussure also informed the mortgagees
that they must employ some other attorney for that purpose.
They did not employ any other, but stopped the suit, and left the
bonds and mortgage in the hands of Mr. De Saussure, giving
him no notice or indication that they did not expect him to act
as their attorney, and so to represent their interests in that behalf
at a future time. I therefore hold that his authority so to rep-
resent them still continued.

After this the said wharves remained for sale in the hands of
L. D. De Saussure, broker, until June, 1873, at which time the
share of John W. Lewis was sold and forfeited to the state for
large arrears of state taxes. This suspended, for some time, the
attempt to sell the wharves as a whole, and the trustees of John
Fraser & Co. advertised their moiety at public sale. That was
stopped by order of the United States court, which then had
charge of the said trust, and which soon thereafter transferred
the authority of the trustees to S. Lord, Jr., referee.

In September, 1873, John W. Lewis, Sr., died insolvent,
leaving very little personal property, and mortgages on all his
real estate, greatly exceeding its market value. All the said

mortgages except that involved in this case, contained power to the mortgagees to sell the mortgaged property. The will of Mr. Lewis gave a like power to his executors, of whom only W. G. De Saussure qualified. In his answer he states that the other executors refused to qualify because of the manifest insolvency of the estate, and that he qualified only for the purpose of enabling him to redeem from the state the forfeiture of the Lewis' interest in said wharves and sell it under the power conferred in the will, for the benefit of the mortgagees. After so qualifying, he continued the authority of the said broker to sell the said property, and Samuel Lord, Jr., referee, also employed him for that purpose, at the same time directing him to obtain authority from the other owners, and to sell the wharves as a whole. They were then very much out of repair and produced no income, or not more than paid their current expenses. That appears by the testimony of Mr. Taft, who says that the Lelands did not receive any income on their share, and paid the taxes thereon from other sources. In this condition of the property an undivided interest in it could not have been sold for its proportionate value in the whole. For that reason, S. Lord, Jr., referee, instructed the broker to obtain authority from the other owners and sell the whole property, and in that form it was offered for sale. In so offering it the broker had no express authority from the mortgagees, except such as could be conferred by W. G. De Saussure, executor of John W. Lewis, who was also their attorney. He believed that in his character as executor he was bound to pay the state taxes as first lien on the said property, and could lawfully sell the same for that purpose, even without the consent of the mortgagees. But he also regarded himself as representing them in the said matter, using his best judgment for their interest, with their knowledge and acquiescence. The price then fixed by him and the other owners for the whole property was $40,000.

Afterwards, the gale of 1874 carried away the wharf pierheads and otherwise so injured the said property and the docks as to make it impossible to use them, except for small vessels. Two or more parties then, or about that time, were in treaty to purchase the said property—none of them made a definite offer for it, except R. Q. Pinckney, president of the Palmetto Cotton

Press Company, who offered for the whole $35,000, which, after some delay and consultation, was accepted on January 4th, 1875. On the same day the written contract was executed by the said purchaser, and by L. D. De Saussure, as broker for the vendors, who immediately thereafter ratified it by their signatures, W. G. De Saussure signing it as executor for the Lewis interest. By this contract the vendors agree to sell their respective shares of the said wharves, but the vendee only contracts for the whole; and so to pay the purchase money, which, by the contract, " is to be divided among the vendors according to their respective interests, when definitely ascertained." The payment was to be " one-fourth cash on delivery of the property, to be held by L. D. De Saussure, as a stakeholder, and the balance when satisfactory and legal titles are executed, by bonds bearing seven per cent. interest, payable in three annual installments, secured by mortgage of the property." The testimony before me proves, to my satisfaction, that the price provided in the contract was a very full price for the said property, and the mortgagees have not produced any counter testimony on that point.

On January 7th, 1875, L. D. De Saussure, as a stakeholder, received the cash portion of the purchase money, and the purchaser immediately went into possession of the wharves. He had employed W. G. De Saussure as his attorney to examine the title. He advised that it was good, and that during the delay required for obtaining conveyances from the vendors, the purchaser might safely take possession and proceed with his proposed improvements. In reliance on that opinion, the said purchaser paid the cash portion of the purchase money, took possession and made the improvements hereinafter stated.

There is some confusion in the testimony as to the time when the mortgagees of Lewis were first informed that the sale had been effected. W. G. De Saussure testifies that it was before he signed the contract; John W. Lewis, Jr., testified that it was in the month of March, thereafter; and Mr. Blake's memory fixes it after the sale, some time in January, and a few days prior to a notice of said sale in the News and Courier. That notice was on the 11th of January, 1875, and on the 26th of the same month is the date of Miss Annely's receipt to Mr. De Saussure

for the said bond and mortgage, of which she then resumed possession. I therefore find, on the testimony of Mr. Blake and on the date of said notice, that the mortgagees were first informed of the sale between January 4th and 11th, 1875, and that they were then " disappointed in the sale."

It is not proved that before that time they expressly authorized their said attorney to sell their interest in the said wharves or to appoint a broker for that purpose. But they had directed a foreclosure of their mortgage in the lifetime of the mortgagor, and only his refusal to consent to it prevented the foreclosure at that time. That obstacle was removed by his death in September, 1873; and from that time until this sale more than fifteen months had passed. During all this delay the mortgagees received no interest on their bonds nor income from the mortgaged property. It was well known to be a very insufficient security for the mortgage, and was continually becoming more so by dilapidation of the buildings, increase of mud and debris in the docks, and by yearly addition of taxes and of interest on the debt. The loss to the mortgagees by this decay of the mortgaged property was not expected by them to be made good from the estate of the mortgagor. He left no other estate, except such as was fully covered by mortgage. Knowing all this, the mortgagees did not, themselves, commence or direct any suit to foreclose their mortgage. Without such suit they could sell the property only through the executor of Lewis, under the power conferred on him by the will. If they had directed their attorney to foreclose by suit at law, it would have been his manifest duty to advise them that a sale in that manner of an undivided share in property so dilapidated would be ruinous to their interests, and that a sale by him, as executor, in concert with the other tenants in common, was the easiest, best, least expensive, and far more advantageous method of foreclosing their mortgage. That method he adopted, and all the circumstances satisfy me that the mortgagees knew of his plan and acquiesced in it. They knew, also, that said property was for sale by the said broker; that is proved by Mr. Blake, who says that some months before this sale he was consulted by the broker about selling it to Mr. Pelzer. They also knew that it was not the equity of redemption,

but the interest of the mortgagees, which was being sold. How else could they have expected to receive the proceeds, and why " disappointed in the price when they heard of the sale?" I am, therefore, forced to find that the mortgagees relied on the judgment of their said attorney to foreclose the mortgage as he might deem best for their interest; that they knew of the plan adopted by him for that purpose, and of his appointment of the said broker to execute it; and that they acquiesced before the sale in the said plan and appointment.

After the sale none of the mortgagees, when informed thereof, gave any notice of their dissatisfaction or dissent, and two of them, F. P. Lewis and John W. Lewis, Jr., who each have an interest of one-sixth of the money secured by said mortgage, signified their concurrence in the sale, and desired to have the matter closed speedily. Whilst the completion of the title was delayed, by reason that the forfeiture to the state must be redeemed before a valid title could be made, the purchasers, relying on the opinion of their said attorney, and having no notice to the contrary, commenced the necessary improvements and repairs, the extent and nature of which had been published in the notice of the News and Courier of January 11th, 1875. That was read by Mr. Blake and John W. Lewis, Jr.; whether also by Mrs. Blake and Miss Annely, is not proved; but Mr. Blake testifies that Miss Annely then lived with him, and that and other circumstances proved by him and by John W. Lewis, Jr., satisfy me that both Miss Annely and Mrs. Blake knew of the proposed improvements and of their progress. During the progress of the work of said improvements, Mr. Blake, being then the personal friend of Mr. Pinckney, considered it his duty to inform him of anticipated difficulty concerning the title to the said property. To this end he asked Mr. Pinckney if he knew of the condition of the bonds and mortgages held by Miss Annely and Mrs. Blake; told him that Miss Annely was peculiar; had great objection to signing legal papers; knew that she would not sign unless they were to get something from the sale; knew, also, that Mrs. Blake would not sign in that case. This notice was not given to Mr. Pinckney as coming from any of the mortgagees or by their authority; on the contrary, Mr. Blake requested

Mr. Pinckney not to mention it. He did not wish the mortgagees to hear or know that he had meddled in the matter; but though he gave this information without their authority, yet it was sufficient to require the purchasers to stop their improvements and await the perfection of their title, if it had been in time. Whatever be its date, whether in the spring, as Mr. Blake thinks, or in June, according to Mr. Pinckney, at either date, it was after that conveyances had been accepted by said purchaser from the other tenants in common, and after the improvements had been contracted for; the foundations of the range of offices had been commenced, part of them laid, and the digging going on for the other part; old buildings had been pulled down and the bricks were being cleaned for the new; and the appropriation of $13,000 to pay the contractor, had been raised to $26,000. If, in that condition of the work, the purchasers had stopped its progress, some further compensation must have been made to the contractor, and the property costing $35,000, and that cost much increased by improvements already made, would have remained in the hands of said purchasers as owners of an undivided interest, not able to derive any income from it so long as the improvements should remain in that condition. The notice of Mr. Blake was, therefore, too late as a precaution of any value to the said purchasers.

The plaintiffs claim that in addition to the record of their mortgage, the purchasers had also special notice thereof, by "a communication" to them. This claim is not proved by any testimony offered before me, but is based on the ground that it is alleged in the complaint and not denied in either answer. I find that Article IX. of the complaint does allege such "communication," but by whom, or when made, or whether it was before or after the "communication" by Mr. Blake to Mr. Pinckney, or whether that was the communication intended, does not appear by the allegation. As Mr. Pinckney testifies that the first notice he had of the mortgage was from Mr. Blake, and as Mr. Blake gave that notice, in the belief that his friend Mr. Pinckney ought to be put on his guard concerning the said mortgage, I find that the "communication" alleged in the complaint, was either that which Mr. Blake made to Mr. Pinckney, or was subsequent

to it. But the attorney employed by the defendants, the purchasers, to examine the title for them, I regard as having, at the time of the contract of sale, express notice of the mortgage, it being then in his hands as attorney for the mortgagees.

Before this conversation Mr. Blake had not conferred with the attorney of the mortgagees concerning the said sale, but John W. Lewis, Jr., had done so several times. His impression now is that said conferences were only casual, or "just so," as he expresses it. I differ from him in that respect, because in other parts of his testimony he says that, after hearing of the sale, "he was very glad to have the whole thing closed, being '*advised*' that it was the best that could be done." That he "was at first surprised at the price, but after consulting with General De Saussure, thought it the best that could be done." It is clear, therefore, that he then regarded Mr. De Saussure as his adviser in the said matter, and that his conferences were with him in that capacity. Mr. Lewis also states that, in said conferences, he spoke only for himself, not for Miss Annely or Mrs. Blake. I do not find that he was ever authorized to speak for the latter, but there is no doubt whatever that he was the channel of communication between the former and her solicitor. He wrote and delivered the first letter which Miss Annely sent, "at his request," asking General De Saussure to take charge of her interest in the matter of foreclosing the said mortgage; and he and Mr. Blake both testify that, in their final interview with General De Saussure, they respectively represented Mrs. Blake and Miss Annely. That final interview was in July, 1875. Mr. Blake and Mr. Lewis had previously talked several times about going to see General De Saussure, but had been delayed. Miss Annely and Mrs. Blake had been asked to have the mortgage satisfied, but had heard "a rumor that the taxes would eat up the whole of the Lewis share," and "they would not satisfy the mortgage without knowing what they were to receive." Accordingly Mr. De Saussure was asked, at this interview, to explain his plans and give a statement of the taxes and expenses.

His plan was that the mortgagees should satisfy their mortgage, so that he, as executor of Lewis, might make good title to the purchaser and receive the purchase money. That the cash

portion and some of the bonds for the credit portion be used to pay the state and city taxes and other charges and expenses, and the balance go to the mortgagees, who were also to petition the legislature to have the penalties, charged for the non-payment of the taxes, in time refunded to them.

This plan was objected to by Mr. Blake, partly because he thought that said penalties, if once paid, would never be refunded, and partly because there was too little (only $3000), left to the mortgagees after deducting taxes, penalties, costs and charges. They, however, took from Mr. De Saussure a full statement of the whole matter and submitted it to Mrs. Blake and Miss Annely, and they, after some consultation, resolved to consult an attorney before making a final decision of the matter.

Accordingly, on July 19th, 1875, Mr. Blake wrote to Mr. De Saussure, informing him that Messrs. Campbell and Whaley had been employed by the mortgagees as their attorneys in said matter. Said attorneys failed to adjust it amicably, and soon after filed the complaint in this case.

Before the date of the said letter the purchasers had been incorporated by the name of the Commercial Wharf and Cotton Press Company, and without notice of the refusal by the said mortgagees, had accepted conveyances from all the other vendors of their respective shares, except for the one-twentieth share of the estate of Mrs. Fitzsimmons. They had also nearly completed repairs and improvements on said wharves, costing $56,500.

These repairs and improvements, or nearly all of them, were necessary to restoring the property to its condition before the war, and without them, or nearly all of them, the said property would not have produced an income. They were made judiciously, and at the lowest cash price. The present market value of the property, so improved, is not more than $80,000. The very full contract price, $35,000, at which it was sold before the improvements, being deducted from the improved market value of the wharves, leaves $45,000, which I find as the actual value added to said property by the improvements; and if said property, as improved, could be sold for more than $80,000, the surplus, over $35,000 to the amount of $56,500, could be attributable only to the value so added.

2 ı

I have therefore reported to your Honor that the sum of $1907.53 is due to the state for taxes on the mortgaged property, and by order of the court I was authorized to pay the same and redeem the forfeiture of the property. Of the amount so reported, $213.15 is due and payable by the defendants, if their contract of purchase be confirmed.

The city of Charleston claims the sum of $3813.30 for taxes due to it on the same property for eight years, beginning with 1867 and ending with 1874, inclusive. Whether that claim be a valid lien on said property, will depend on the matters of law, as set forth in the legal issues of this report.

ISSUES OF LAW.—On the issues of law involved in this case, I respectfully report:

*First.* That the executor of John W. Lewis, Sr., could not, under the power conferred on him by the will of Lewis, sell the said property discharged of the mortgage, unless the mortgagees assented to that manner of foreclosure. It had been forfeited to the state, and that discharged the lien of the mortgage, but such discharge was, at any time, capable of being set aside by the redemption of the property, either by the mortgagor or his personal representative, or, if he failed to redeem, then by the mortgagees. No other person, as the law then stood, could so purchase the property as to acquire the right to redeem it, other than in the name of the mortgagor. But if redeemed in his name, the effect of that would be to restore not only the former title, but also the former liens, according to their respective priorities. The tax was a first lien, but an executor is under no obligation to pay taxes on real estate, unless there are personal assets in his hands to be appropriated for that purpose; but his obligation to pay taxes as a first lien out of the personal assets, does not carry with it the power to marshal the liens on the real estate which is under mortgage. The mortgagor could not sell real estate, encumbered by a first and a second mortgage, in order to pay the first, nor could he sell real estate discharged of the first mortgage, in order to pay taxes or any other prior lien. Having, therefore, no such power himself, he could not, by his will, confer it upon his executor.

*Secondly.* I find that the said executor, in his character as attorney of the mortgagees, could not, without their consent, express or implied, foreclose their mortgage by a private sale of the mortgaged property; nor could he, without such consent, authorize a broker to make a contract of sale which would bind them. But I have heretofore found, as an issue of fact, that the said mortgagees, in the matter of the proper method of foreclosing their mortgage, relied upon the judgment of W. G. De Saussure, as their attorney; that they knew of his plan for that purpose, and acquiesced in it before the sale; that after the sale two of them ratified it and that the other two did not, in reasonable time, repudiate it. It follows, therefore, that under these circumstances they should be held bound by the said contract of sale, and should be decreed to complete it. Their previous acquiescence in the plan adopted by their attorney was an equivalent to an agreement by them to satisfy their mortgage if a sale should be made by their attorney, and the co-operation of the other tenants in common in effecting a sale of the whole property, in a manner most advantageous to the mortgagees and all interested, was a sufficient valuable consideration to support the joint agreement to sell in that manner.

*Thirdly.* As to two of the mortgagees, F. P. Lewis and John W. Lewis, Jr., I find that the former has filed no answer in this case, and that nothing appears before me herein showing that he has any desire to be relieved from his express ratification of the said sale after it was made. The latter seems to claim that he ought not to be held to his ratification, because, he says, that his assent was upon the advice and supposition that the completion of the said sale was the best that could be done. But he has not attempted to prove any mistake in that advice, nor has he produced before me any testimony to the effect that a better sale of the said property could have been made in January, 1875, or could now be made, the property being in the same condition as at that time. I therefore perceive no equity for releasing him from his said ratification, and find that both he and F. P. Lewis are expressly bound, to the extent of their interest in the said mortgage, by the said contract of sale.

As to Miss Annely and Mrs. Blake, I find that apart from

their acquiescence in the plan of their attorney before the sale, their long silence afterwards, during which the purchasers, without notice from them, accepted conveyances of undivided interest in the said property from other tenants in common, and made costly improvements on the property, created new equities in favor of the said purchasers, which not only strengthen the implied agreement of the said mortgagees prior to the sale, but also constitute of themselves an equitable foundation for a decree of specific performance. Before the other tenants in common conveyed their undivided interests to the purchasers they had an acknowledged right to compel a sale of the whole for partition. *Pell* v. *Ball*, 1 *Rich. Eq.* 361. But they did not exercise that right, because of their belief, at that time, that all parties in interest had agreed to a private sale, and to that end had united in a contract of sale, which purported to give the purchaser a good title to the whole property. That contract so made was manifestly advantageous to all the vendors, including the mortgagees, and if the latter had in time given notice of their refusal to complete the sale, and the other tenants in common had made them parties to a suit against the purchaser for a specific performance, upon the proof offered before me in this case, they would then have been compelled to perfect the title of the purchasers. In such case the court would have regarded the true interests of all the parties before it, and would not have permitted one co-tenant, or the mortgagees of a co-tenant, to defeat a sale so manifestly proved to be advantageous to all who had any interest in the property, unless some proof had been offered that it was possible to make a better sale. In such a case as between the tenants in common and against the consent of one or more of them, it would even have the right to assign the property to one of the co-tenants at an appraised value, and if such would be the power of the court as against a tenant in common, who holds the *legal* title, its power is certainly no less, but rather greater, against his mortgagee who holds only an *equitable* title. In foreclosing that, the court may make such decree as shall best protect the rights and equities of all parties to the suit; to that end it may sell the mortgaged property at public or private sale, and on such terms and in such manner as may seem best to the court. In

*Stoney* v. *Schultz*, 1 *Hill Ch.* \*465, the mortgaged property was ordered to be sold on credit, though the whole of the mortgage debt was then due, and in order to protect the rights of purchasers of portions of the mortgaged property, it was decreed to be sold in lots and in such order as the equities and priorities of the said purchasers required. I cannot doubt that a similar power over the mortgage would have been exercised by the court in this case, and upon the abundant and uncontradicted proof that this contract of sale secured a very full price, the court would not have subjected the other tenants in common to the loss of the advantages of this contract; on the contrary, it would have compelled the mortgagees to perfect the title and the purchasers to complete their purchase. What the court would have done in favor of the equities of the other tenants in common, in case they had been compelled to apply to it for a decree of sale in partition, it will now do in favor of an innocent purchaser, who had contracted for the whole property, and who, believing that he was finally to get a good title for the whole, accepted the conveyances of the other tenants in common, and, without any notice that his title was not to be perfected, made improvements on the common property, which considerably exceed, in cost and value, the price at which it could have been sold before it was improved.

*Fourthly*. If my findings be correct on either of the above issues of law, it will be unnecessary to consider whether the purchaser will be entitled to a charge on the property for the value which his improvements have added to it. On the issues of fact I have found that the said property was in ruinous condition when the purchasers took possession thereof, and that all, or nearly all, the improvements they have made were necessary to restore it to its former condition. It is, therefore, claimed that it is a case of repairs, and that one tenant in common, in possession, may repair and charge the cost thereof to the common property. That might be so if, on proceedings in partition, the property could be divided without sale, and the improved portion could be set off to the tenant who made the improvements. But when this cannot be done, then the right of one tenant in common to have the cost of repairs refunded to him is limited to

the necessary repairs of a house or mill, and even in that case he must show that he requested his co-tenant to join in making such repairs, and that he refused to do it. 4 *Kent* 370. But I do not regard the work done on the property involved in this case as repairs. That relates only to buildings or structures still standing, though dilapidated, and yet capable of being made useful by repair without being pulled down and rebuilt. To erect a new building in such case, even with the old material, is not to repair, but to rebuild, and that is improvement, not repairs. If one or more tenants in common unite to purchase a house, a mill, or a factory, an agreement between them to keep it in repair would probably be presumed in law, but no such agreement would be presumed in case of the total destruction of such house, mill, or factory. I therefore find that the new wharf, new offices and new sheds, which were built upon the old sites of former buildings by the purchasers in this case, were improvements, and that the value thereof would not be a charge on the property if made by owners of undivided interests, unless they then supposed that they were to obtain good title to the other interests. On this point the decisions of the courts of this state are very clear. The cases of *Hancock* v. *Day, McM. Eq.* 69; *Thompson* v. *Bostick, Id.* 75; *Dellett* v. *Whitner, Chev. Eq.* 213; *Thurston* v. *Dickinson,* 2 *Rich. Eq.* 316, and *Corbett* v. *Laurens,* 5 *Rich. Eq.* 301, all agree and settle that one tenant in common may not, without the consent of the other tenant, improve the common property, as a charge thereon, for the cost of said improvements.

But the purchaser claims to be refunded the value of his improvements under the betterment act of this state. *Rev. Stat.* 559. The constitutionality of this act is questioned by the plaintiffs' attorneys, who cite on that point *Green* v. *Biddle,* 8 *Wheat.* 100. They also claim that this is a case of purchase from the mortgagor of property encumbered by mortgage which was duly recorded, in which case the purchaser as against the mortgagee, in proceedings to foreclose the mortgage, will not be allowed the value of his improvements out of the mortgaged property. *Hughes* v. *Edwards,* 5 *Cond. Rep.* 657. This doctrine would certainly be applicable to this case, if it were a pur-

chase from the mortgagor, without the supposed concurrence of the mortgagee; but in my finding on the facts I have concluded that though the mortgage was on record, and though the purchasers' attorney had express notice of it, yet they supposed at the time of the purchase that all parties having any interest united in the said sale, and that the improvements were made by the purchasers in that belief and without notice to the contrary. Their case is, therefore, clearly that of purchasers for valuable consideration, improving the property with the knowledge of the mortgagees, and without any notice from them of their intention not to perfect the title. After silence on their part, until the improvements were almost completed, they come into a court of equity to foreclose their mortgage, and claim not only the mortgaged property according to its value at the time these innocent purchasers took possession, but also, in addition thereto, the improvements they placed upon it. To such case the betterment act would apply, if the suit were on the law side of the court; its intent is to afford the defendants in suits at law the same relief which, before the act, a court of equity had power to give, according to the doctrine that " he who comes into that court seeking equity must do equity." This doctrine I regard as plainly set forth and elucidated in the following cases, to wit : *Green* v. *Biddle, supra; Southall* v. *McKean,* 1 *Wash.* 336 ; *Coulter's case,* 5 *Co.* 30 ; *Putnam* v. *Ritchie,* 6 *Paige* 391 ; *Bright* v. *Boyd,* 1 *Story* 478 ; 2 *Id.* 615 ; *Lowndes and I'on* v. *Chisolm,* 2 *McC. Ch.* 455.

On the authority of the above cases I hold that if it were possible in this case to conclude, as matter of fact, that the mortgagees of Lewis never assented to or acquiesced in the sale made in this case by W. G. De Saussure, their attorney, and that without their consent it was sold by him, as executor, solely under the power conferred on him by the will of Lewis, yet even in that case, as he believed when he made the sale that the said authority conferred on him was sufficient to enable him to convey to the purchasers a valid, unencumbered title, and so advised the purchasers, and as they looked to him as their legal adviser in that behalf, if he was mistaken in law, and by that mistake caused the purchasers to make improvements on the property,

believing that their title to it was good, they will be compensated for their improvements out of the lands to the extent added thereby to its value.

This doctrine of relief against a mistake in law was subsequently fully discussed and maintained in *Lawrence* v. *Beaubein*, 2 *Bail.* 647, and *Gist* v. *Gist, Bail. Eq.* 343, which settled conclusively, as the law of this state, that a mistake of law is ground for relief as clearly and as fully as a mistake of fact. See, too, *Dellet* v. *Whitner, Chev. Eq.* 213.

From the above-cited cases it is manifest that Judge Story was mistaken in supposing that he was the first to extend the *equitable* doctrine of compensation for improvements to the case of a claimant by land by *legal* title—our judges had preceded him in that matter by many years, and are quite as decided and as clear upon the point as he was.

In this case plaintiffs claim the land, not by *legal* title, but by the lien of a mortgage, which, under our law, is only an *equitable* title. As against such title, under all the decisions, even as restricted by the case of *Green* v. *Biddle,* and the subsequent case decided by Chancellor Walworth, the defendants are entitled, out of the mortgaged property, to the amount of the value added by their improvements; and, under the cases in this state, I would hold the same; under the circumstances of this case, even if the plaintiffs held the *legal* title. If this view be correct, there will be no necessity to order a re-sale of the property, because, according to the facts found by me, whatever it could be sold for above the contract price in this case would be due to the value of the improvements, and could not amount to their actual cost. The defendants should, therefore, not be subjected to the inconvenience and expense of a re-sale, which could not possibly benefit the plaintiffs.

The plaintiffs excepted to the findings of fact by the referee upon the questions of authority of W. G. De Saussure to act for them, and acquiescence and ratification by them, and also as to betterments, rents and profits, and actual notice by the purchasers of the wharf. Upon the referee's conclusions of law, the plaintiff's exceptions were as follows :

1. Because the referee erred in finding that the plaintiff, Julia A. Blake, the executrix of Maria A. Annely, could not recover the whole debt of her testatrix, because of the acts of the legatees, John W. Lewis, Jr., and F. P. Lewis.

2. Because the referee erred in finding, that even in the absence of authority from, or acquiescence in, or ratification by the plaintiffs, they should be required to complete a contract of sale to which they were no party.

3. Because the referee erred in finding that the mortgagor, who was a tenant in common, could, together with the other tenants in common, make a partition among themselves which could affect the rights of the mortgagee without his consent.

4. Because the referee erred in finding that the Commercial Wharf Company was a *bona fide* purchaser.

5. Because the referee erred in finding that a contract at private sale between tenants in common, should be enforced against the mortgagee, simply because he concludes it to be their interest, from the testimony of witnesses called by the purchaser from the mortgagor.

6. Because the referee erred in finding that the plaintiffs were bound by the acts of Col. Blake, John W. Lewis, Jr., and F. P. Lewis.

7. Because the referee erred in applying the doctrine of *mistake of law,* and in finding that the wharf company was entitled to relief, when the plaintiffs sought to enforce no contract against them, and only required them to account for rents and profits from the time of filing this complaint for foreclosure.

8. Because the referee erred in extending the doctrine of allowance of improvements to a case in which the occupants of the land had knowledge of the true state of the *title,* as well as of the *encumbrance* thereon.

9. Because the referee erred in applying the law, that allows the mortgagee in possession for his improvements, as against the mortgagor, to the case of a mortgagee out of possession against an occupant under the mortgagor.

The decree of the Circuit judge confirmed the report of the referee, and concluded as follows:

It is further ordered that the said Commercial Wharf and

Cotton Press Company do pay to the referee the sum of $8750, with interest thereon from January 4th, 1875, less the amount paid through said referee for taxes due to the state on said property, in accordance with his report; and that upon receiving said sum the referee do enter satisfaction as of record upon the mortgage held by the plaintiffs.

It is further ordered that the referee, after paying the costs of the plaintiffs, do pay over the remainder of the sum so received by him to the plaintiffs in this case, and that they have leave to enter up their decree for the amount remaining unpaid on their bonds against the estate of Lewis; to be paid in due course of administration of said estate.

From this decree the plaintiffs appealed upon the several grounds taken as exceptions to the referee's report.

The defendant, W. G. De Saussure, appealed upon the ground that his Honor should have ordered that out of the proceeds of sale, after the payment of costs, there should be paid to the defendant a commission of five per cent. for effecting the sale, either as executor of John W. Lewis, under the power of sale contained in his will, or as agent or attorney of the plaintiffs, as reported by the referee.

*Messrs. B. J. Whaley* and *J. B. Campbell,* for plaintiffs.

*Messrs. De Saussure & Son,* for the executor of J. W. Lewis.

*Messrs. Simonton & Barker,* for wharf company.

October 30th, 1879. The opinion of the court was delivered by

WILLARD, C. J. The action is for the foreclosure of a mortgage. The complaint alleges that J. W. Lewis gave a mortgage to the plaintiff, Amelia L. and to Anna Maria Annely, to secure two several bonds, one to the said Amelia and one to Anna M., covering the undivided one-fourth part of certain wharf property in the city of Charleston, known as the commercial wharves. That Anna M. has died, leaving a will, of which the plaintiff, Julia A. Blake, is executrix; that J. W. Lewis, the

mortgagor, has died also, and that the defendant, W. G. De Saussure, is his executor. The proper parties appear to be before the court.

The executor of the mortgagor, J. W. Lewis, and the Commercial Wharf Company, answered, setting up a contract of purchase, under which the Commercial Wharf Company claim to have become the owners of the wharf property, made by the executor of J. W. Lewis, under a testamentary power of sale, and by the other parties owning the remaining three-fourths of the property, and claim to have made valuable improvements on the property, greatly enhancing its value, rendered necessary by injuries arising from various causes to the structures on the wharf property. It does not appear by the answer that the mortgage has ever been satisfied, or the mortgaged land released by the mortgagees, but certain matters are set forth which are claimed to have extinguished the right of the mortgagees under this mortgage, and to have subjected them to certain equities set forth by the defendants, as arising out of their contract of purchase. The nature of these claims will be stated in connection with the discussion of the question raised upon them.

The case was heard before a referee, and a decision rendered sustaining the claims of the defendants.

The report was confirmed by the Circuit Court, and the plaintiffs now appeal, alleging exceptions to various points of decision made by the report of the referee.

The referee holds that the plaintiffs are bound by the contract made by the executor of the mortgagor, on the ground of acquiescence. He says: " I am, therefore, forced to find that the mortgagees relied on the judgment of their said attorney to foreclose the mortgage, as he might deem best for their interests; that they knew of the plan adopted by him for that purpose, and of his appointment of the said broker to execute it; and that they acquiesced before the sale in the said plan and appointment."

The foregoing implies that W. G. De Saussure, executor of the mortgagor, was also the attorney of the mortgagees, and that whatever he thought advisable to do in this double character, bound them, as the act of their attorney, to such extent, at least, that, unless they expressly objected to his action, they were

bound, by the principle of acquiescence, to the extent of destroying the lien of their mortgage. Although his conclusion is stated by the referee as a conclusion of fact, it is evidently a mixed conclusion of law and fact.

It is doubtful, on the face of the answer of Mr. De Saussure and the testimony, whether either the plaintiffs or Mr. De Saussure himself considered that the relation of attorney and client existed between them at any time subsequent to the death of J. W. Lewis, the mortgagor. Mr. De Saussure says, in his answer, that in the summer of 1872 the plaintiffs " placed the said bonds and mortgages in the hands of this defendant, professionally, to foreclose said mortgages, and the papers, by way of summons and complaint, were prepared for the purpose, but in consequence of an objection made by the said John W. Lewis, the said plaintiffs instructed this defendant not to proceed further in the matter. The said bonds and mortgages remained in the hands of this defendant until January 26th, 1875, when they were delivered up to the plaintiff, Amelia L." This is the only statement of the relations of the parties in question that we can find in the answer of Mr. De Saussure, and it falls far short of claiming that the relation of attorney and client existed between himself and the plaintiffs after the decease of Mr. Lewis. We find no evidence in the testimony of the existence of such relation after Mr. De Saussure became the executor of Mr. Lewis. The continuance of that relation cannot be presumed, for the obvious reason that when Mr. De Saussure became the executor of the mortgagor he assumed responsibilities inconsistent with his acting as the professional adviser and representative of the plaintiffs.

Finally, it is clear that Mr. De Saussure did not regard himself as acting in the interest of the plaintiffs, for it appears by his own testimony, as well as that of another witness, that when in consultation as to the possible effect upon the treaty with the Commercial Wharf Company of the refusal of the plaintiffs to assent to such contract, he assumed the ground that if their consent was withheld the title might be made through the forfeiture of the land for non-payment of taxes. If Mr. De Saussure had supposed that he was under an obligation to pursue the interests of the plaintiffs, he could not and would not, as we are

bound to say, have devised any mode of carrying out the plans of the other parties in disregard of their interests. In this respect it is apparent that the referee has done Mr. De Saussure unintentional injustice.

But if Mr. De Saussure had been the attorney and counselor of the plaintiffs it would not follow that without special authority he could make a contract that would so far bind his clients that they could only discharge such obligation by express notice repudiating his authority.

The relation of attorney and client implies authority to enforce the demands of his client, of obtaining either voluntary or coercive satisfaction of such demands, and to bind the client as a party litigant in certain matters appertaining to the conduct of causes; but it does not confer a general power of attorney to contract independently in relation to such demands, nor to transfer such demands to a third party. The proper duty of a counselor is to advise his clients; if he becomes a negotiator, a business manager, it is through some other form of authorization than that implied in being selected as a legal adviser merely.

The evidence shows no authority in Mr. De Saussure to bind the plaintiffs by any contract whatever.

The first proposition of law by the referee, adverting to the fact that the property had become forfeited in the state for non-payment of taxes, says: " It had been forfeited to the state, and that discharged the lien of the mortgage, but such discharge was at any time capable of being set aside by the redemption of the property, either by the mortgagor or his personal representative, or, if he failed to redeem them, by the mortgagees." If this be taken as a correct statement of the rights of the parties as against the state, then the forfeiture to the state was not absolute, but leaving outstanding a right of redemption; whether legal or equitable, the state would be regarded as holding title as security for a debt, and its rights would be in the nature of a mortgage prior to that of the plaintiffs. How the existence of such a prior mortgage could extinguish the lien of a subsequent mortgage, when there was a clear right of redemption for the latter to act upon, is inconceivable.

It may be as well in the present connection to notice the

general question as to how far the consequences of the forfeiture of the land to the state by the failure to pay taxes can be brought into the case, thus anticipating the fifth proposition of law.

Only the right existing between the plaintiffs and defendants can properly be considered in the present case. Can a mortgagor, in a suit for foreclosure, set up title in a third person, not a party to the suit, and in which he has no interest? Clearly he cannot. If so, then in case the mortgagee was let into possession, on condition broken, and the mortgagor put to his bill to redeem, the mortgagee could plead as against such right of redemption title outstanding in a third person, with which he was disconnected.

The action is based upon the rights existing between mortgagor and mortgagee. The mortgage being established, as between the mortgagor and the mortgagee, and a breach shown, the only right of the mortgagor that can be considered is that of the right of redemption.

If the mortgage binds nothing by reason of title outstanding in a third person, then the equity of redemption is valueless, and the mortgagor has no interest to defend.

Nor could the title of such third person be examined unless he is made a party. The state is not a party in the present case, neither is any person a party claiming to have derived title or to hold under the state.

When a mortgagor remains in possession of the mortgaged premises, as was the case here, he is entitled to the rents and profits of the mortgaged lands without liability to account. He should accordingly pay annual taxes, as he has the fund out of which they should be paid, namely, current income. If there happen to be no income, that does not change the legal relations of the parties. The mortgagor is not bound to hold possession, and may throw the entire burden of protecting the mortgaged lands upon the mortgagee by surrendering possession. If he does not choose to do so he can gain no advantage by suffering taxes to accumulate or allowing the land to become forfeited or sold for taxes. Certainly, in a court of equity, he would stand in a bad light, alleging that through his failure to keep down taxes the mortgagee had lost the lien of his mortgage, and thus

claim to be left, or that his assignees may be left, in undisturbed enjoyment of the mortgaged premises as against the mortgage.

Whether the land mortgaged has been forfeited for non-payment of taxes, or whether there is or is not a right to redeem them by law in the parties to the suit, or whether the lands are in the position of being chargeable with state or city taxes, are circumstances altogether immaterial to the present question. If the taxes claimed to be due to the state and city are to be regarded as still operative as a lien on the lands in the hands of the proper legal owners, then, as was held in *Smith* v. *Gatewood,* 3 *S. C.* 333, they are to be regarded as liens prior to that of the mortgage, and title made under a decree for the plaintiffs must be subject to such liens, unless provision is made for the payment of such taxes out of the proceeds of the sale of the mortgaged lands. To accomplish this it is not necessary or proper that either the state or the city should be made parties to such action. The state and city have a right to choose their own methods, as allowed by law, of enforcing their taxes, and should not be subjected to the expense of becoming parties to all suits incidentally involving questions of taxation, as was said in *Smith* v. *Gatewood.* Under proper administrative orders the officer authorized to sell for foreclosure may apply the proceeds of sale to the payment of taxes. If there is a question as to the legality of the taxes imposed, the course to be pursued can be fixed in suitable administrative orders.

It, therefore, follows that all that is decided by the referee in regard to an outstanding title in the state for taxes, and as to the proper mode and effect of redemption, and as to the effect of unpaid state and city taxes, the right of the parties, is foreign to the issues in the present case.

The conclusion of the referee, that forfeiture to the state discharged the mortgage, was erroneous.

The conclusions as to the powers of the executor of the mortgagor to pay taxes, are quite immaterial to the present case. They may tend to show that the mortgagor had not, by any intentional default, suffered the lands to become forfeited by non-payment of taxes, but as no such charge is made by the plaintiffs the inquiry is immaterial. The fact that the executor

of the mortgagor has had no means of keeping down the taxes, cannot benefit the assignee of the mortgagor or prejudicially affect the rights of the plaintiffs, as mortgagees, in any way.

The second conclusion of law is based upon the finding of fact in reference to acquiescence on the part of the plaintiffs in the action of Mr. De Saussure, and is already disposed of by the conclusion of fact above stated, that no authority in Mr. De Saussure is shown sufficient for a foundation for the application of the principle of acquiescence.

The third proposition advanced by the referee holds that F. P. Lewis and J. W. Lewis, Jr., co-devisees with the plaintiff, Julia A., under the will of Anna M. Annely, deceased, and made defendants to the complaint, are bound to the other defendants, on the ground of acquiescence.

F. P. Lewis and J. W. Lewis, Jr., are not before us as appellants from the decree, and, therefore, it must stand as against them. It cannot, however, bind the plaintiff, Julia A. Blake, in either of the characters in which she sues, viz., as devisee of A. M. Annely or as executrix of the latter. As devisee, it leaves her share of the estate of her testator unaffected. As executrix, it excludes her from claiming in the right of F. P. Lewis and J. W. Lewis, Jr., co-devisees, as equity will look through her title, as executrix, to the substantial rights it covers, and finding that F. P. Lewis and J. W. Lewis, Jr., have bound their interests in the manner determined by the decree of the Circuit Court, it will not permit the executrix to set up in their right, what they themselves could not demand as against their co-defendants. But, for all that appears before us there may be other interests, as that of creditors of the testator, entitled to such protection, who would not be affected by any act of such devisees, and who are not parties to the action; as to such possible rights there must be an inquiry in the Circuit Court, under proper orders, to be made conformable to the judgment of this court, and the rights of such third parties, if any there be, placed on the same footing with those of the executrix and devisee, Julia A.

The referee also holds that the plaintiffs, Miss Annely and Mr. Blake, are bound to the defendants also, on the principle of

acquiescence, independently of the authority conferred upon their alleged attorney, constituting "an equitable foundation for a decree of specific performance."

This conclusion states, as its grounds, two facts. *First,* their silence while the defendants were purchasing, without notice from them, from other tenants in common. *Second,* the additional fact of such silence, while the purchasers were. making valuable improvements on the premises. This proposition is not correct, unless a general rule can be stated to this effect, that a mortgagee of an undivided interest in lands, under a recorded mortgage, is bound to give express notice of a refusal to be bound by a sale made by his co-tenants, holding in common with the mortgagor,. when such co-tenants are known to be dealing with the land in contravention of such mortgagee's rights. This is an extraordinary conclusion which, if sound, will tend to impair materially the value of mortgage securities of that class.

One who purchases lands bound by a recorded mortgage, buys with notice. It is equally so whether the mortgage effects an undivided interest in the land or the entire interest. The statute determines what the notice shall be and nothing more can be exacted either at law or in equity. The purchaser purchases at his peril, having the right to demand access to the instruments that constitute the title he is purchasing, and all legal encumbrances upon it.

It is said that the purchase was made in the belief that the executor of the mortgagor had authority from the mortgagee to release the mortgage; then it was the obvious right and duty of the purchaser to demand proof of such authority. It was not to be assumed that the mortgagee would place in the hands of the executor of the mortgagor unlimited power of negotiation, and of canceling or discharging the mortgage. It does not appear that Mr. De Saussure ever asserted that he had such authority; on the contrary, it appears that he looked to the right of the state in virtue of forfeiture of the lands for non-payment of taxes as the means of making title in the purchaser in case the plaintiffs would not concur in his plans. There is no evidence to show that any conduct on the part of the plaintiffs, or either of them, contributed to impress the minds of the purchasers

with the idea that Mr. De Saussure possessed the authority they now allege that they thought he possessed. There is no foundation in the evidence, or the reasonable presumptions therefrom, for applying to these plaintiffs any limitation of the rule of conduct affecting all other mortgagees of undivided interests in lands.

The referee, in discussing this question, refers to the right of partition that existed among the tenants in common, and says: " But they did not exercise that right because of their belief at that time that all parties in interest had agreed to a private sale, and to that end had united in a contract of sale, which purported to give the purchaser a good title to the whole property."

The fact that they did not exercise the right of partition is of importance, but the reason why they did not is altogether unimportant, unless that reason involves something tending to affect the equities or legal rights of the plaintiffs. The statement here is simply as to the belief of the purchaser founded on the contract of purchase itself. That contract was in writing, and did not purport to contain the signature of the plaintiffs, or of any one assuming to sign in their behalf. They could have drawn no such inference from the contract.

The referee, further discussing the same question, goes on to state that the contract was advantageous to the parties, and if the plaintiffs " had, in time, given notice of their refusal to complete the sale, and the other tenants in common had made them parties to a suit against the purchasers for a specific performance, upon the proof offered before me in this case, they would have been compelled to perfect title in the purchaser." If the referee here means to say that the court would have specifically enforced the contract on general equitable considerations, independently of proof of authority in Mr. De Saussure to bind the plaintiffs, it is not easy to see what ground there is for the conclusion. Of course, it will not be contended that one tenant in common can compel another by suit for specific performance, or in any other manner, to consent to and be bound by the contract of the former to sell the land held in common, upon the ground that the contract is advantageous to the latter.

It may be that the referee contemplated partition proceedings

in his remark. If so, his conclusion is equally erroneous, for in partition the court would not have adopted a private sale by one tenant in common as the basis of a decree enforcing such contract of a sale as against one refusing to be bound by it, however advantageous it might seem. Individuals make contracts for themselves; not the courts for them. The courts merely enforce that which is accomplished in the right and by the mind of the parties.

The result of a partition would have been the sale of the land at public sale, if it could not be actually partitioned with reasonable convenience. Perhaps, in such a case, the land might have brought less than the purchaser was willing to pay for it. That is a matter for the consideration of the parties, who are not wards of the court or dependent on its assistance.

The referee is equally in error in holding that in such a writ " the court would have regarded the true interests of all the parties before it, and would not have permitted one co-tenant or the mortgagees of a co-tenant to defeat a sale so manifestly proved to be advantageous to all who had any interest in the property, unless some proof had been offered that it was possible to make a better sale." The courts do not undertake to enforce the interests of parties *sui juris,* but to enforce their rights. They may not allow their views of interest to prevail against rules of law and equity, but will not supplement their errors and fallibilities nor coerce their stubbornness from a more enlightened view of their interests than they themselves are willing and able to take. These principles are fundamental to enlightened jurisprudence. Nor would the court look to the interests of the tenants in common as a class as distinct from their individual interest, for there is no other bond, legal or equitable, between them than that their several rights meet in the same subject of property. There is nothing in the nature of an obligation arising from a contract, express or implied, existing between them that equity can lay hold of to give shape to their common rights and conduct. They are neither a legal corporeity nor related by any fiduciary tie nor obligation to pursue a common object. Both law and equity can, under certain circumstances, apply as between them certain modifications of the ordinary rules relating

to ownership in severalty. So equity may intervene to disasseverate their possession by dividing or selling the property for division of the proceeds, but that is accomplished not to carry out any equity implied in the relation, but to sever it on equitable principles.

The referee further says: " In such a case as between tenants in common and against the consent of one or more of them, it would even have the right to assign the property to one of the co-tenants at an appraised value." It is not necessary to inquire whether as between tenants in common, like the present, deriving their title from distinct and independent sources, and not distributees or devisees from a common ancestor, the court could exercise the right here indicated ; it is enough to know that no such authority has been exercised.

The essential feature of this proposition is the idea that one tenant in common may sell the entire lands held in common as if they were his own in severalty, and if called into a court of equity may validate his action, if he can show that under a proceeding in such court for purchase he might have by some means been enabled to reach the same practical result.

The purchasers do not ask a decree in the nature of partition based upon the rights of the parties as they stood at the time of suit brought. But what they ask is a decree of the character that would have been made had partition been obtained at the time they became purchasers of the property. They do not want the value of the property, as it stands, the basis of partition, but its value at the time of purchase. The proposition of the referee is, then, that the act of the co-tenants as affecting the plaintiffs, considered as representing the interests, subject to mortgage, was equivalent to a decree and sale in partition, subject to the right of the court to say that it was not well grounded in equity. Thus the co-tenants are the court of original jurisdiction, and the Circuit Court a revisory body to record its decrees, if not found wanting equity.

The court of equity often applies the principle of approving, when done without its authority, that which it could have authorized, and which it clearly appears it would have authorized. It will not be pretended that the court could authorize

one tenant in common to exercise the power of partition as against his co-tenant or one claiming in his right, nor will it sanction that which it could not authorize. The act of the co-tenants, under whom the purchasers claim, was an assertion of dominion merely; what is essential to separate tenancies in common is judicial authority; the court cannot make the one the equivalent of or the substitute for the other.

The referee adds : " If such would be the power of the court as against a tenant in common who holds the *legal* title, its power is certainly no less, but rather greater, against the mortgagee who holds only an equitable title." It is true that he does not hold the title to the land while the mortgagor remains in possession, but he holds the lien or security on the land by a legal title. *Simons* v. *Bryce,* 10 *S. C.* 354.

It is erroneous to suppose that a mortgagee holds only an equitable title to his security. The statute (*Gen. Stat.* 536) only takes away possessory action by the mortgagee while the mortgagor is in possession, but by so doing recognizes that the mortgagee has a legal title to the security. The equitable doctrine that a mortgage is a mere security for debt, on which the statute was founded, does not affect the character and nature of the title passed by the mortgage, for that existed independent of equity, but limits the use of that title against the mortgagor. A right created at law is none the less a legal right in its nature, because equity holds it affected by equitable considerations.

The statement of the referee, that in foreclosing " the court may make such decree as shall best protect the rights and equities of all parties to the suit," is correct, but may be misunderstood. The object of foreclosure is clear and definite. It is to sell the land by judicial sale, bar the equity of redemption, and give a personal decree, when demandable, for any deficiency of the proceeds of sale to pay the mortgage debt. The rights of mortgagors and mortgagees may become affected by and complicated with many circumstances giving rise to legal or equitable consequences that can be observed by the court. This does not, however, authorize the court to leave the beaten track of a familiar proceeding to devise more perfect methods of subserving the real or supposed interests of the parties.

The referee further adds that the court "may sell the mortgaged property at public or private sale, and in such terms as may seem best to the court." We know of no authority to sell at private sale under a decree of foreclosure *in invitum*. To a certain extent the court may fix the terms of sale, but an order for that purpose is made for the mutual benefit of all concerned, based solely on the ground of placing the property in the best marketable condition; it cannot be construed into a right to change the relative rights of the parties as they stand under the mortgage.

He finally concludes, on this point: "What the court would have done in favor of the equities of the other tenants in common, in case they had been compelled to apply to it for a decree of sale in partition, it will now do in favor of an innocent purchaser, who has contracted for the whole property, and who, believing that he was finally to get a good title for the whole, accepted the conveyances of the other tenants in common, and, without any notice that his title was not to be forfeited, made improvements on the common property which considerably exceed in cost and value the price at which it could have been sold before it was improved." The basis of this proposition we have considered and denied, namely, that upon partition the co-tenants, other than those represented by the plaintiffs, could have compelled the plaintiffs to accede to their contract of sale, because it was advantageous. If, then, the purchasers have equities against the plaintiffs, it must be upon other grounds than that these expectations are disappointed. Equity does not deny the fundamental principles of law. It does not assume to equalize among men the consequences of errors of judgment or misfortune. It is not a chimerical expediency, but a resolute system, looking to rights according to their proper equitable interpretation. It sometimes exercises providential care in the right of those incapable of representing themselves or protecting their own interest, but independently of this peculiar jurisdiction, inapplicable to the present case, it is contented to see that the dealings of men are just and equal, without attempting to insure that the practical and material results of those dealings shall be

distributed with theoretical equality. To do this would transcend the offices of Divine Providence.

If there are any equities in favor of the views presented by the referee, they must arise from the proposition that it is inequitable and unconscionable for the plaintiffs to avail themselves of the benefits conferred on the mortgaged property by the improvements put upon it by the purchaser, and of the enhanced value of the property resulting from such improvements. This is not equivalent to asking whether, in the forum of private conscience, the plaintiffs could justify the acceptance of these benefits procured by the means and effects of others. Equity does not administer the dictates of private conscience, but certain rules that have been justly called the conscience of the court. If, therefore, the claims of the plaintiffs are inequitable and unconscionable, it is because they contravene fixed rules and principles of equity. Do they ?

It is clearly inequitable for a party to demand the fruit of fraud, misrepresentation or dissimulation. The plaintiffs are free from any such charges. It is not inequitable for a mortgagee to claim the benefits of all improvements put on the mortgaged premises. The mortgage is a security for a fixed sum, that cannot be decreased by injury to or destruction of the property, or increased by adding value to it. In the present case, the value of the mortgaged premises was impaired by the casualties of war and tempest. Had the mortgagor himself rebuilt, there would not have been a question but that in legal and equitable consideration, the right of the mortgagee to go upon the improvements for the satisfaction of his mortgage, would have been perfect. How can the plaintiff's rights be less, so far as restoration has been accomplished by the assignee of the mortgagor. If a mortgaged house is consumed by fire and rebuilt by the mortgagor or his assignee, has there ever been a question whether it was equitable for the mortgagee to assert his mortgage, as it regards such improvements? So far as it regards the question of improvements made jointly by the assignee of a tenant, subject to mortgage, and his co-tenants, not affected by such mortgage, or as in the present case, by a party uniting both these characters, no inquiry has been made and findings of fact presented, enabling

this court to determine whether the improvements are of a nature, and the property so circumstanced, as to call for the recognition of equitable severalty in them, as regards the undivided interest derived under different titles. *Williman* v. *Holmes*, 4 *Rich. Eq.* 475. For the want of a proper basis of fact, that question cannot be considered in the present stage of the case; but there should be an inquiry into such facts and proper action thereon.

But should it appear that the improvements must enure to the benefit of the plaintiffs, it is not inconsistent with any rule of equity that they should insist on such demand. On the other hand it would be entirely inconsistent with equitable rules to deny to the plaintiffs relief to which they are entitled, simply because it imposes hardship on the purchaser.

We cannot say that the purchaser, if compelled to suffer hardships, is free from fault in the matter. It was the plainest dictate of prudence to perfect their title before expending upon the improvement of the property. If the purchaser felt secure on account of the forfeiture to the state, that expectation rested on a speculation that contemplated the entire loss to the plaintiffs of their mortgage security through taxation, and its failure entails upon the plaintiffs no duty to submit to the destruction by the arm of equity of that which has escaped the hardships of taxation.

Nor is there any reason to say that the plaintiffs have received benefit from the improvements by the purchaser, and, therefore, an equity rises against them. The object of the defence is not to obtain compensation for benefits conferred, but to deprive the plaintiffs of the right themselves. But the conclusive answer to the proposition under consideration is, that improvements put upon mortgaged lands, are not, in equity, regarded as benefits conferred on the mortgagee, nor can this conclusion be changed by the circumstances of the particular case, as it regards the sufficiency of the security without the improvements.

The application made to the case by the referee of the betterment law, and the equitable principles analogous to those to which that law relates, rests upon two grounds. The first has already been disposed of, inasmuch as it involves the supposed acquiescence of the plaintiffs; the other will be considered.

Referring to *Lowndes* v. *Chisolm*, 2 *McC. Ch.* 455, the ref-

eree says: " On the authority of the above case, I hold that if it were possible in this case to conclude, as matter of fact, that the mortgagees of Lewis never assented to, and acquiesced in, the sale made in this case by Mr. De Saussure, their attorney, and that, without their consent, it was sold by him as executor, solely under the power conferred on him by the will of Lewis, yet even in that case, as he believed when he made the sale, that the said authority conferred on him was sufficient to enable him to convey to the purchaser a valid, unencumbered title, and so advised the purchaser, and, as they looked to him as their legal adviser in that behalf, if he was mistaken in law, and by that mistake caused the purchaser to make improvements on the property, believing that the title to it was good, they will be compensated for their improvements out of the lands to the extent added thereby to their value."

In other words, if the mortgagor, being the legal adviser of a third party, says he has authority to make good title as against a recorded mortgage, and such third person takes title under such assurance, he shall be so far released from the mortgage as to be protected as to all improvements made on the premises, whether such representation was correct or incorrect. If correct, he holds through its truthfulness; if incorrect, in virtue of its being a mistake.

The attention of the referee evidently was not called to *McDow* v. *Brown,* 2 *S. C.* 95, where the equitable relief afforded by equity in cases of mistake, was considered very fully upon the authorities. It will not be necessary again to develop that subject. It is enough for the present case to quote the language of Chancellor Dargan in *Murrel* v. *Murrel,* 2 *Strob. Eq.* 148, who says: " A party fully competent to protect himself, under no disability, advised as to all circumstances by which he may be saved his rights, or in a situation where he might, by due diligence, be so advised, not overreached by fraud, concealment or misrepresentation, nor the victim of mistake, against which prudence might have guarded, has no right to call the courts of justice to protect him." This is sufficient to deprive the purchaser of the equitable relief demanded, as we have already seen.

It is held in *McDow* v. *Brown,* as to mistakes of fact, that "when a mistake has arisen without the fault of either of the justices   *   *   *   relief is granted only when the mistake is mutual." In the case, as presented by the purchaser, the mistake, if any was made, was one of fact as to whether the executor had been authorized to act for the plaintiffs in the manner contended for. That question has been considered in this case as one of fact alone, for it is not pretended that the executor had any implied or presumable authority whatever, or any other authority, except such as might be conferred by some act of the plaintiffs susceptible of proof as matter of fact. It was not a mistake as to the relationship or rights of the parties, nor as to the construction of a power in a will, deed or contract, nor in any other sense a mistake of law. Had there been a mistake of law on the part of the legal adviser of the purchaser, it is not clear how the consequences of that mistake could have been visited on the plaintiffs, especially when, by prudence, it might have been avoided, but the case presents no such question.

In *McDow* v. *Brown,* the case of *Lowndes* v. *Chisolm* is considered, and it is said that it "did not necessarily depend on the power of equity to grant affirmative relief on a bill alleging mistake, but upon the principle that when parties are before the Court of Equity seeking equity, the court will look into transactions collateral to and dependent upon the principal subject of inquiry, in order that full justice may be done."

*Lowndes* v. *Chisolm* stands upon the equities between a surety on a bond, additionally secured by mortgage, and the obligee of the bond subsequently becoming purchaser of the mortgaged property. The question of relief in equity for mistake of law is there discussed, but not with the view to lay down any final rule on the subject. But with that doctrine we have no concern at present.

The question of taxation raised by the fifth proposition of the referee, has already been disposed of. The conclusions of the referee as to interest, being based upon views from which this court dissents, are erroneous.

The decree of the Circuit Court and the report of the referee, so far as inconsistent herewith, should be set aside, and the cause

remanded for proceedings conformable to what is here determined. As has already been said, there should be an inquiry under proper orders to ascertain whether there are parties other than the devisee, Julia A. Blake, and the co-devisees, entitled to participate in the assets of the estate of Anna M. Annely, who, on the foregoing principles, ought to be considered. An inquiry should also be made into the situation and circumstances of the mortgaged property, with a view to determine whether actual partition can be made, and a decree made for the sale of the undivided one-fourth part of the property, in case such actual partition cannot be had, with liberty to the defendants, if they desire, to have the whole property and improvements sold, as for partition among them, to have it decreed accordingly, application of the proceeds of such sale to the payment of the amount found due on the mortgage to be made, as to their extent upon the principles of this decision, and in accordance with the determination of this matter reserved for further consideration by the Circuit Court.

HASKELL, A. J. I concur in the opinion that the judgment should be reversed, upon the ground that there is a total lack of evidence to support the conclusion that the executor of Lewis, either in that character or personally, had authority to act for the mortgagees, or that the mortgagees ratified his action as to them by acquiescence or otherwise. I concur further in the opinion that such parties in interest as have not taken an appeal are bound by the Circuit decree. The mortgage, therefore, to the extent not thus affected, remains a lien on the interest held by Lewis. What that interest is, has not been considered by the Circuit judge, for the whole case turned upon the point which is error, and the right to foreclose being thus denied, the question of partition was never reached.

In concur, therefore, in the opinion that the case should be remanded for such further proceedings in the court below as may be necessary, in conformity with the views expressed by the Chief Justice on the points above indicated.

McIVER, A. J., dissenting. This was an action to foreclose a mortgage executed by the testator, John W. Lewis, to secure the payment of two bonds held by the plaintiffs respectively. The mortgage covered an undivided fourth part of the commercial wharves, a property situate in the city of Charleston.

The issues of law and fact were referred to a referee whose report contains such a full and clear statement of the facts as to render a repetition of them here wholly unnecessary.

To this report various exceptions were filed by the plaintiffs, all of which were overruled by the Circuit judge, and from his judgment this appeal is taken upon the same grounds as are set forth in the exceptions to the referee's report.

It is very manifest that if the conclusions of fact reached by the referee and confirmed by the Circuit judge can be sustained, there is no ground for this appeal.

The rule that the findings of fact by a referee, concurred in by the Circuit judge, will not be set aside unless they are without any evidence to sustain them, or are manifestly against the weight of evidence, is so well settled and has been so frequently announced by this court that it is not necessary to cite the cases establishing it. Without entering upon a detailed examination of the testimony in this case, with a view to justify the conclusions of the referee, which is as unusual as it would be unnecessary in this case, it is enough to say that, in my judgment, after a careful examination of the testimony, there is no sufficient ground for disturbing the findings of fact by the referee, concurred in, as they are, by the Circuit judge.

It certainly cannot be said that the conclusions of fact reached by the referee are without any evidence to maintain them, and I do not think that they are manifestly against the weight of the evidence. On the contrary, it appears to me that there is very strong support for the main finding of fact that Mr. De Saussure, in making the sale, acted with the knowledge and assent of the mortgagees, in the undisputed fact that they were disappointed in the results of the sale.

This shows two things: First, that they knew of the terms of the sale, as otherwise there would be no reason in their expressing dissatisfaction; and, second, that they then understood that

the entire fee was sold and not merely the equity of redemption. For, if it was merely the equity of redemption which was sold, then there was no conceivable reason why they should express disappointment at the sale, as their rights could not possibly be prejudiced thereby, but they would, on the contrary, be actually benefited. The testimony leaves no doubt, not only of the fact that the property was sold for its full fee simple value, but that by selling the whole property together, rather than the one undivided fourth separately, upon which alone the plaintiffs had a lien, that fourth brought more than it would have done if sold as an undivided share. It is impossible, therefore, to believe that a mortgagee would express dissatisfaction at a sale of the equity of redemption in the property covered by his mortgage for a price equal to its full fee simple value, as by that means his chances for realizing the whole of his debt would be legally increased, especially in a case like the present, where the property mortgaged constituted the *sole* security, (the mortgagor being insolvent,) and was encumbered by a large arrearage of taxes which would have to be first paid out of the proceeds of a sale ordered to foreclose the mortgage. *Act of March 19th*, 1874, § 126, 15 *Stat*. 774. In addition to this it may be remarked that the testimony tends to show that the disappointment of the mortgagees arose, not from the fact that the sale was an absolute sale of the entire interest nor from the price obtained, but from the apprehension that the proceeds of the sale of the share upon which their lien rested would be wholly, or to a large extent, consumed in the payment of taxes and other charges, leaving but little, if anything, to be applied to the mortgage.

Another circumstance which tends to strengthen the conclusion of the referee is that neither of the plaintiffs has ever yet denied the authority of the executor to make the sale, or their full knowledge of an acquiescence in his proceedings up to the time of the sale, neither of them having been examined as witnesses in the case. Numerous references were held, continuing from day to day, and although it was manifest from the course of the testimony that the defendants relied upon the fact that the executor in making the sale acted with the knowledge and assent of the mortgagees, as evidenced by the testimony in regard

to conversations between Blake and Lewis, who were alleged to be the agents of the plaintiffs, and the executor, and the message sent to them by the executor before concluding the contract of sale, yet neither of the plaintiffs were put upon the witness stand to disavow the authority of the executor to sell, or to deny any knowledge of, or assent to, his proceedings.

Another circumstance in support of the view taken by the referee is to be found in the condition of things existing at the time, which rendered it highly probable that the mortgagees would have done just what the referee has found they did do for the protection of their own interests. Here were mortgagees holding a mortgage as the *sole* security for their debt which was rapidly increasing in amount, no payment having been made in about ten years upon property on which large arrearages of taxes had accumulated, which the mortgagor had no means of paying, and which the mortgagees do not appear to have taken any steps to provide for, though the property covered by the mortgage had been forfeited for non-payment of taxes, and the time allowed for redemption was rapidly drawing to a close, in which event the security would be wholly lost. Under these circumstances the most ordinary prudence would seem to prompt the mortgagees not only to assent to, but gladly adopt any scheme by which the property could be sold to the best advantage and at the least cost possible, whereby a portion at least of their debt might be saved. This is exactly what was done. The testimony places it beyond dispute that the mortgaged property was sold to the best possible advantage, without cost to the mortgagees, and after relieving the tax encumbrance, a balance is left to be applied to the mortgage debt. Thus, the result has proved the wisdom of the course adopted by the executor, with the knowledge and assent of the mortgagees, as the referee finds, and as I must believe from all the circumstances of the case.

The apparent inconsistency of Mr. De Saussure's acting both as executor of the mortgagor and as attorney or agent for the mortgagees is more apparent than real. He states in his answer what all the circumstances of the case confirm, that he qualified as executor only for the purpose of enabling him to benefit the mortgagees. The estate of the mortgagor was confessedly in-

solvent, and the only source from which the debt of the plaintiff could be paid was the mortgaged property, which, under the power of sale contained in the will, could be sold by the executor without delay and expense incident to an action for foreclosure. He was, at the time he qualified, the attorney of the mortgagees, entrusted with the bonds and mortgage for the very purpose of effecting a sale of the mortgaged premises, " all parties consenting," which possession continued until after the sale was made without any change in his instructions; and as the course which he adopted, in the condition of things then existing, was, as we have seen, undoubtedly the best for the interest of the mortgagees, as well as for the estate of the mortgagor, I am unable to perceive any real inconsistency in his conduct.

Nor do I think any weight should be attached to the remark attributed to Mr. De Saussure—that if the mortgagees refused to recognize his action they could be forced to do so by reason of the fact that the property had been forfeited for taxes—because, it will be remembered, that this remark was not made until after the sale, and after he had discovered that the mortgagees were disposed to repudiate his action in making the sale. It cannot, therefore, be fairly argued that this plan of perfecting the title in the purchaser was present to or influenced his mind at the time he made the sale.

A more reasonable inference would be that it was the offspring of a natural irritation at finding that the mortgagees were disposed to repudiate his action, taken, as he supposed, and as he had good reason to suppose, with their assent and for their benefit.

The point raised by the appeal on the part of the executor of John W. Lewis does not appear to have been taken before the referee or in the court below, and is not properly before us for consideration.

I am satisfied, therefore, that the judgment of the Circuit Court should be affirmed.

Decree reversed.